IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:25-CV-00646-FL

| | |
|---|---|
| **Rebecca Snipes,**<br><br>Plaintiff,<br><br>v.<br><br>**Frank J. Bisignano,** Commissioner of Social Security,[1]<br><br>Defendant. | **Memorandum & Recommendation** |

Plaintiff Rebecca Snipes challenges an Administrative Law Judge's decision to deny her application for social security income. Snipes claims that the ALJ made three errors in reaching that decision. First, the ALJ erred in evaluating the medical opinion evidence. Second, he misconfigured her residual functional capacity (RFC). And third, the ALJ wrongly evaluated Snipes's subjective statements. Both Snipes and Defendant Frank Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 12, 18.

After reviewing the parties' arguments, the court has determined that the ALJ reached the appropriate determination. Snipes objects to the ALJ's consideration of the medical opinion evidence. But the ALJ offered sound reasons why he afforded the opinions partial weight or less weight. A challenge to the RFC determination similarly fails because it turns on the unconvincing argument that the ALJ misevaluated the medical opinions. The undersigned also finds no merit to Snipes's contention that the ALJ's grounds for rejecting her subjective statements are infirm.

[1] The court substitutes Frank J. Bisignano for former defendant. *See* Fed. R. Civ. P 25(d).

Instead, the record supports the ALJ's reasons to find her statements did not track the record. So the undersigned recommends that the court grant Bisignano's request for relief, deny Snipes's request for relief, and affirm the Commissioner's determination.[2]

## I. Background

### A. Factual

Snipes suffers from fibromyalgia, osteoarthritis in her feet and left wrist, degenerative disc disease, and psoriatic arthritis, as well as depression and anxiety. Tr. at 1097. Around the time of the April 2014 alleged disability onset, her primary care provider prescribed medications to treat her pain, fibromyalgia, and mental health symptoms. Tr. at 1100. Examinations found generally normal results. *Id.*

Two years later, Snipes had a consultative examination with Dr. Ayman Gebrail. Tr. at 1104. She had a normal gait but painful range of motion in her joints, along with tenderness and decreased motion in her back. *Id.* Dr. Gebrail determined that her pain may cause difficulty with prolonged standing and walking, heavy lifting, and bending, twisting, pushing, and pulling. *Id.*

Henry Tonn, M.S., performed a consultative psychological evaluation that was co-signed by Michael Affemann, Ph.D. Tr. at 394–97. Records show that Snipes was somewhat anxious and occasionally tearful. Tr. at 1105. Her recent memory was fairly good but her remote memory was rather vague. *Id.* Tonn assessed mild to moderate persistent depressive disorder. *Id.* He determined that Snipes could perform simple, routine, repetitive, tasks, interact with peers and coworkers, respond appropriately to supervision, and maintain concentration and persistence. *Id*.

Her provider referred Snipes to specialists to assess various symptoms she reported. Tr. at 1100. She saw a neurologist in May 2016 for her complaints of memory loss. *Id.* On exam, she

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

had a normal memory, an appropriate mood and affect, some tenderness, and a slightly ataxic gait. *Id.* The provider believed Snipes's medications may have caused her reported memory issues. *Id.*

X-rays showed moderate multilevel degeneration in Snipes's cervical and lumbar spines. *Id.* Neurological testing that summer yielded "essentially normal" cognitive results. Tr. at 1101. Tests also showed normal gait and motor function with no assistive device. *Id*.

Snipes reported increased pain in her legs and back in October 2016. *Id.* On exam, she had diminished sensations and reflexes and an unsteady gait. *Id.* And MRI revealed spondylosis and multilevel degenerative disc disease along with an extradural mass at the thoracic level. *Id.* Providers attributed her memory troubles to her anxiety and depression. *Id*.

Snipes saw Dr. Zicheng Li for pain management one month later. *Id.* Her physical exam was unremarkable, with normal gait, strength, sensation, and range of motion found along with appropriate mood and affect. *Id.* Dr. Li recommended medication, pain cream, injections, exercises, braces, and physical therapy. *Id.* He advised her to avoid heavy lifting and forward bending and instructed Snipes to use an assistive device as needed. *Id.* The next month, Snipes reported that injections resolved her leg pain and cream remedied her joint and neck pain. *Id.* Medication improved her back symptoms although she still had some pain. *Id*.

Snipes also saw a rheumatologist for her diffuse pain which she attributed to fibromyalgia. *Id.* A May 2016 exam noted a normal to slightly ataxic gait. Tr. at 1101–02. She had tenderness in her left wrist, with x-rays showing osteoarthritic changes. Tr. at 1102. Treatment notes reflect other musculoskeletal findings were normal. *Id.*

At a return visit the next month, Snipes noted improvement with a steroid taper. *Id.* She had decreased range of motion in her neck and a slightly ataxic gait. *Id.* Providers assessed psoriatic arthritis, osteoarthritis, and fibromyalgia and prescribed medication. *Id.*

In July, there was a change in her medication regimen. *Id.* An exam found spinal tenderness and a slightly ataxic gait. *Id.* A few days later, though, she had an unremarkable examination. *Id.* Two months later, Snipes complained of diffuse pain in her joints and extremities and noted that medication had offered minimal benefit. *Id.* By December, she was "doing okay" overall with fair symptom control. *Id.* An examination was unremarkable, with a normal gait observed. *Id*.

Snipes also saw a podiatrist for her bilateral foot pain. *Id.* In April 2016, an examination found pain with motion, reduced strength, and an antalgic gait. *Id.* X-rays showed degenerative changes and a pes planus deformity. *Id.* The podiatrist assessed degenerative joint disease, for which she received steroid injections. *Id.*

At a follow-up visit, Snipes reported three months of pain relief with the injections. *Id.* Treatment notes show tenderness and painful range of motion. *Id.* The podiatrist again administered injections. *Id.* She returned in November with unchanged findings and again received injections. *Id.* Snipes sought no further podiatric care for almost a year. *Id.*

State agency physicians determined that Snipes could perform medium work with postural, manipulative, and environmental restrictions. Tr. at 1104.

For her mental health, Snipes's primary care provider prescribed psychotropic medications for most of the period at issue before the ALJ. *Id.* She started formal mental health treatment in April 2016, reporting marital issues and fear over her spouse's health. *Id.* Treatment records reflect a depressed and anxious mood and short-term memory problems. Tr. at 1104–05. Providers diagnosed major depressive disorder with anxious distress and mild alcohol use disorder. Tr. at 1105.

At a follow-up psychiatry visit five months later, treatment notes reflect that Snipes had a depressed and irritable mood, restricted affect, and impaired attention, concentration, and recent

memory. *Id.* The following month, she had intrusive thoughts and an impaired memory. *Id.* In December, Snipes showed a depressed mood, restricted affect, and impaired concentration. *Id.* But the mental status examination was otherwise unremarkable. *Id.* Records reflect that she responded well to treatment. *Id.* Around that time, her treating psychiatrist, Dr. Richard Carlson, opined that Snipes had marked to extreme limitations in several areas of mental work activity. *Id.*

State agency psychological consultants concluded that Snipes had no more than moderate limitations in mental functioning. *Id.* And they found that she could perform a range of unskilled work. *Id.*

**B. Procedural**

In September 2015, Snipes applied for disability benefits alleging a disability that began in April 2014. After the Social Security Administration denied her claim at the initial level and upon reconsideration, Snipes appeared for a hearing before an ALJ to determine whether she was entitled to benefits. The ALJ determined Snipes had no right to benefits because she was not disabled from her alleged disability onset date through December 2016 when she was last insured. Tr. at 15–30 (2019 ALJ decision).

After the Appeals Council denied review, Snipes filed a complaint in this court. Concluding that substantial evidence did not support the disability determination, the district court remanded the matter. *See Snipes* v. *Saul*, No. 7:20-CV-88-BO, Order. D.E. 28 (E.D.N.C. Sept. 15, 2021).

Snipes participated in a second hearing before the ALJ in May 2023. The ALJ again determined Snipes had no right to benefits because she was not disabled. Tr. at 1094–1108 (2023 ALJ decision).

The ALJ found that Snipes lived with several severe impairments. Tr. at 1097. These include degenerative disc disease of the cervical and lumbar spine, extradural mass at T6-T7,

obstructive sleep apnea (OSA), osteoarthritis of the left hand and bilateral ankles and feet, psoriatic arthritis, gastroesophageal reflux disease (GERD), bilateral pes planus, fibromyalgia, depressive disorder, and anxiety disorder. *Id.* The ALJ also found that Snipes's impairments, either alone or in combination, did not meet or equal a Listing impairment. *Id.*

Next, the ALJ determined that Snipes had the residual functional capacity (RFC) to perform light work with other limitations. Tr. at 1099. She can frequently climb ramps and stairs and only occasionally climb stepladders up to four feet in vertical height. *Id.* But Snipes cannot climb higher ladders nor ropes or scaffolds of any heights. *Id.*

She can frequently balance, kneel, and crouch, and occasionally stoop and crawl. *Id.* Snipes can frequently reach with her bilateral upper extremities except that she could only occasionally reach overhead and bear weight overhead. She can frequently handle, finger, push, and pull with her bilateral upper extremities. *Id.* And Snipes may have occasional exposure to extreme cold and heat, vibration, atmospheric conditions, and high, exposed places. *Id.*

Snipes can perform work needing little or no judgment to perform simple duties that can be learned on the job or in a short period of time (usually within 30 days) for which little specific vocational preparation and judgment are needed. *Id.* She can sustain concentration and persistence for no more than two-hour intervals. *Id.* And Snipes cannot work in jobs that are frequently performed on an assembly line or at a similar production pace. *Id.*

Snipes can tolerate occasional changes in the work setting and the manner and method of performing the assigned work. *Id.* She can frequently perform jobs that have two 15-minute breaks and one 30-minute break for each eight-hour shift worked, occurring at such times as the employer directs. *Id.* And she can have occasional interactions with others. *Id.*

Then the ALJ concluded that Snipes could not perform her past relevant work as a machine packager. Tr. at 1106. But considering her age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Snipes could perform. Tr. at 1106–07. These include cleaner/housekeeper, marker, and routing clerk. *Id.* These findings led the ALJ to conclude that Snipes was not disabled from 2014 through 2016. Tr. at 1108.

After the Appeals Council declined review, Snipes commenced this action in April 2025. D.E. 1. Both parties seek a decision in their favor. D.E. 12, 18.[3]

## II. Analysis

Snipes asserts that the ALJ erred in evaluating the medical opinions and failing to adopt the limitations they assessed. But a review of the disability decision discloses the reasons why the ALJ accorded less weight to their findings. And the evidence supports his analysis.

Snipes also argues that the RFC determination is unsound because it failed to incorporate limitations assigned in the medical opinions. Because she premises this challenge on the previous issue, which lacks merit, the undersigned finds no error in the ALJ's RFC determination.

And Snipes takes issue with the ALJ's consideration of her subjective statements. But the ALJ's decision discloses how her allegations differed from other evidence in the record. While Snipes may disagree with his assessment, she identifies no error.

The issues she raises provide Snipes with no grounds for relief. So the undersigned recommends that the court deny her claims and affirm the Commissioner's determination.

[3] Snipes filed another claim for benefits in 2020, and the SSA found her entitled to disabled window's benefits as of April of that year. Tr. at 1094.

### A. Standard for Review of the Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id*.

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is unwarranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Opinion Evidence[4]

Snipes first alleges that the ALJ erred in considering the medical opinions from Drs. Li, Carlson, and Gebrail. The Commissioner contends that the ALJ properly explained why these

[4] Because Snipes filed her disability claim before the revised rules regarding the assessment of medical opinion evidence took effect in March 2017, the analysis cites the rules in effect when Snipes filed her claim.

medical opinions deserved less weight. The undersigned concludes the Snipes fails to show that the ALJ erred in considering this evidence.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson* v. *Comm'r of Soc. Sec.,* 600 F. Supp. 2d 740, 752 (W.D. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

Opinions of treating physicians and psychologists on the nature and severity of impairments must be given controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Craig* v. *Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *Ward* v. *Chater*, 924 F. Supp. 53, 55–56 (W.D. Va. 1996); SSR 96–2p, 1996 WL 374188 (July 2, 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590. In determining the weight to be ascribed to an opinion, the ALJ should consider the length and nature of the treating relationship, the supportability of the opinions, their consistency with the record, any specialization of the source of the opinions, and other factors that tend to support or contradict the opinions. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Ashmore* v. *Colvin*, No. 0:11–2865-TMC, 2013 WL 837643, at *2 (D.S.C. Mar. 6, 2013) ("In doing so [i.e., giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

Opinions from "other sources" who do not qualify as "acceptable medical sources" cannot be given controlling weight but are evaluated under the same factors used to weigh the assessments of physicians and psychologists. SSR 06–03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006); *see also* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (identifying "other sources"). An ALJ must explain the weight given opinions of "other sources" and the reasons for the weight given. SSR 06–03p, 2006 WL 2329939, at *6; *Napier* v. *Astrue*, No. TJS-12–1096, 2013 WL 1856469, at *2 (D. Md. May 1, 2013).

Similarly, evaluations from sources who neither treat nor examine a claimant are considered under the same basic standards as evaluations of medical opinions from treating providers whose assessments are not given controlling weight. *See* 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). The ALJ must explain the weight given to these opinions. *Id.; Casey* v. *Colvin*, No. 4:14-CV-00004, 2015 WL 1810173, at *3 (W.D. Va. Mar. 12, 2015), *adopted by*, 2015 WL 1810173, at *1 (Apr. 21, 2015); *Napier*, 2013 WL 1856469, at *2.

More weight is generally given to the opinion of a treating source over the opinion of a non-treating examining source. Similarly, the opinion of an examining source is typically given more weight than the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(c)(1), (2), 416.927(c)(1), (2). Under appropriate circumstances, however, the opinions of a non-treating

examining source or a non-examining source may be given more weight than those of a treating source. *See, e.g.*, *Mastro* v. *Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (affirming ALJ's attribution of greater weight to the opinions of a non-treating examining physician than to those of a treating physician); SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Opinions from medical sources on issues reserved to the Commissioner, such as disability, deserve no special weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96–5p, 1996 WL 374183, at *2, 5 (July 2, 1996). But the ALJ must still evaluate these opinions and give them appropriate weight. SSR 96–5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator must evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

**1. Dr. Li**

Dr. Li first treated Snipes in November 2016. Tr. at 1101. The physical exam was unremarkable, and she displayed a normal gait. *Id.* Dr. Li recommended treatment with medication, physical therapy, back and neck braces, and injections. *Id.* He directed Snipes to avoid heavy lifting and forward bending and to use an assistive device as needed. *Id.*

The next month, Snipes noted improvement, although her back pain persisted. *Id.* An examination again was largely unremarkable. *Id.*

The ALJ gave little weight to Dr. Li's assessments, finding they were neither supported by nor consistent with the record. *Id.* The ALJ pointed out that Dr. Li assigned the restrictions at

Snipes's first appointment. *Id.* But later visits showed improvement in her pain symptoms with cream and injections. *Id.* Snipes had a normal gait and an unremarkable exam at follow-up appointments. *Id.* The record contained no evidence that she used an assistive device during the relevant period. *Id.* And the ALJ noted that some terms were vague, as Dr. Li did not explain what heavy lifting involved. *Id.*

Snipes argues that Dr. Li's opinion deserved more weight. She points out that he is a treating provider and he endorsed the conclusions made at her first appointment at later visits. Snipes also maintains that the record bolsters his findings. Bisignano contends, and the undersigned agrees, that substantial evidence supports the ALJ's consideration of Dr. Li's opinion.

At her first appointment, Dr. Li's examination noted normal gait, strength, sensation, and range of motion. He recommended treating Snipes's symptoms with medications, creams, exercise, physical therapy, and injections. She later reported improvement in her pain, although some back pain continued.

Snipes points out that Dr. Li renewed his November 2016 findings at later appointments. His continuing treatment relationship may have been a basis to accord his assessment more weight.[5] But the subsequent visits noted improvement in symptoms, which would render the limitations he found less credible.

Although the applicable regulations direct an ALJ to give controlling weight to a treating source's opinion, the rule is not absolute. An ALJ may assign less weight to such an opinion if there is persuasive, contradictory evidence. *Mitchell* v. *Schweiker*, 699 F.2d 185, 187 (4th Cir.

---

[5] At the time of Snipes's first visit when he rendered his assessment, Dr. Li was more like a non-treating, examining provider. *See* 20 C.F.R. § 404.1527(a)(2) (noting a treating source as one with an ongoing treatment relationship with the claimant). As their treating relationship grew through later appointments, he became a treating source.

1983). As noted above, the ALJ must consider certain factors when he gives less than controlling weight to a treating source opinion. 20 C.F.R. §§ 404.1527(c)(1)-(6),

Under the § 1527(c) factors, the ALJ's decision touched on the relationship between Snipes and Dr. Li as both an examiner and in providing treatment. Tr. at 1101. The ALJ remarked that Snipes saw Dr. Li for pain management. *Id.*

But the ALJ noted that Dr. Li's findings were not well supported or consistent with the record. *Id.* Snipes's leg, neck, and joint symptoms improved with pain cream and injections. *Id.* Like the first appointment, follow-up visits noted normal gait, strength, sensation, reflexes, and range of motion. *Id.* The rheumatologist also noted normal physical exam findings, including a normal gait. *Id.* The record contained no reference to the use of an assistive device during the relevant period. *Id.* Dr. Li's conclusions departed from Snipes's conservative course of treatment. *Id.* And the vagueness of what he meant by heavy lifting detracted from the value of the assessment.

So the ALJ properly explained why he assigned Dr. Li's assessment only partial weight. And the reasons he offered are sound. Contrary to Snipes's position, the ALJ did not err in failing to assign Dr. Li's opinion controlling weight.

Snipes's argument is thus one of disagreement, not error, in how the ALJ considered the evidence. It is not the role of the reviewing court to weigh evidence or make findings faced with conflicting evidence. *See Johnson* v. *Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (reviewing court should not seek to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ).

So the undersigned recommends that the court reject her argument on this issue as it lacks merit.

### 2. Dr. Carlson

Dr. Carlson, Snipes's treating psychiatrist, determined that she had moderate to extreme limitations in several areas of mental work activity. Tr. at 718–20, 1105. He noted that her severe depression, mood swings, and side effects from medication may decrease her alertness. Tr. at 718. And Snipes's chronic pain limited her ability to focus and concentrate. Tr. at 719. Dr. Carlson pointed to her fibromyalgia and psoriatic arthritis as contributing factors to her reduced functioning. *Id*.

The ALJ gave the opinion little weight, noting that Dr. Carlson offered it in December 2018, two years after the disability determination period at issue ended. *Id.* He also remarked that the findings conflicted with treatment records which routinely showed normal mental status exams. *Id.*

Snipes contends that the timing of Dr. Carlson's assessment forms an inadequate basis to reject it. But the undersigned concludes that the remoteness of the opinion is a valid reason to assign it less weight.

Snipes must show she became disabled before December 2016, when her insured status expired. *Johnson*, 434 F.3d at 656. Evidence after a claimant's date last insured (DLI) is not automatically discounted because it "may be relevant to prove a disability arising before the claimant's DLI." *Bird* v. *Comm'r of Soc. Sec,* 699 F.3d 337, 340 (4th Cir. 2012). Evidence after the DLI is generally admissible if it "permits an inference of linkage with the claimant's pre-DLI condition." *Anderson* v. *Kijakazi*, No. 4:23-CV-01131, 2024 WL 1528458, at *9 (D.S.C. Jan. 18, 2024), *adopted sub nom. by Anderson* v. *O'Malley*, No. 4:23-CV-01131, 2024 WL 1069936 (D.S.C. Mar. 12, 2024) (citing *Bird*, 699 F.3d at 341).

Here, Dr. Carlson's December 2018 opinion was a three-page, check-box form with little additional information offered to support its conclusions. It does not explicitly relate Snipes's limitations at that time to her condition two years earlier, before her insured status expired. And there is no basis to infer that the opinion informs her functional abilities during the relevant period. *See Parker* v. *Berryhill*, 733 F. App'x. 684, 687 (4th Cir. 2018) (finding that linkage is not present where the post-DLI evidence provide no information about the claimant's pre-DLI functional limitations). Lacking any connection to the period at issue, the ALJ had no obligation to give retrospective consideration to Dr. Carlson's findings.

Snipes also argues that the ALJ failed to explain how Dr. Carlson's determination diverged from other records. Yet a review of the disability determination discloses the how the assessment departed from the evidence. Overall, mental status examinations were generally unremarkable, noting occasional findings like depressed mood and irritability, and identified no significant abnormalities. Tr. at 1098, 1104–05. Snipes responded positively to treatment, with her mental health symptoms well managed with medication. *Id.* State agency reviewers concluded that Snipes had no more than moderate limitations in the four mental functioning domains. Tr. at 1098, 1105. And a consultative examiner concluded she was less limited than Dr. Carlson determined. Tr. at 1105. So Snipes's argument is unconvincing.

Nor is there any merit to Snipes's other contentions. She maintains that the ALJ wrongly relies on mental status examination findings by non-mental health providers over the findings of her treating mental health care provider. Yet the other mental status findings in the record are relevant and properly considered by the ALJ.

And Snipes asserts that the ALJ misstated the evidence, as the record contained entries supporting Dr. Carlson's conclusions. But this argument misses the mark. The ALJ's decision

noted that, at times, the record showed depressed mood, irritability, anxiousness, impaired concentration, and problems with memory. Tr. at 1104–05. Yet the longitudinal record revealed generally unremarkable mental status findings and a positive response to treatment, with medications providing good symptom control. Tr. at 1098, 1104–05. So Dr. Carlson's conclusions did not track the overall evidence related to Snipes's mental health during the relevant period.

Finding no error in the ALJ's consideration of Dr. Carlson's opinion, the court should reject Snipes's claim on this issue.

**3. Dr. Gebrail**

Dr. Gebrail's March 2016 consultative evaluation noted Snipes's normal gait but painful range of motion in her joints and spine and diffuse tenderness. Tr. at 1104. Among other things, Dr. Gebrail determined that Snipes may have trouble with prolonged standing and walking, heavy lifting, and some postural movements due to her pain. *Id.*

The ALJ gave this evaluation partial weight. *Id.* He found that the opinion was not fully consistent with or supported by the overall record which showed several benign exams and conservative treatment. *Id.* And he did not define "prolonged" or "heavy" in assessing restrictions. *Id.* But the ALJ determined that the RFC allowing a reduced range of light work accounted for Snipes's pain and limited spinal motion. *Id.*[6]

[6] The District Court's remand order found that the ALJ had not adequately considered the treating source factors when evaluating this opinion. *Id*. But the ALJ remarked that Dr. Gebrail was not a treating provider, having examined Snipes only once. *Id*. The ALJ is correct that Dr. Gebrail's opinion is not one from a treating source. Instead, having conducted a consultative examination, he is considered a non-treating, examining source. *See Wright* v. *Colvin*, No. 1:16-CV-12, 2017 WL 833059, at *3 (W.D.N.C. Mar. 2, 2017) (noting that a consultative examiner is a non-treating source); *Batson* v. *Colvin*, No. 7:14-CV-48-D, 2015 WL 1000791, at *8 (E.D.N.C. Mar. 5, 2015) (adopting recommendation that noted consultative examiners were non-treating sources); 20 C.F.R. § 404.1527 (defining a non-treating source as a medical source who has examined a claimant but does not have an ongoing relationship with them, such as one seen solely for report regarding disability claim). So the ALJ properly disregarded the directive to apply the treating source factors in considering Dr. Gebrail's assessment.

Snipes argues that the record shows that no examinations were benign. She disputes that the restrictions assigned were vague and maintains that the ALJ should have explained how he resolved any ambiguity. And Snipes takes issue with assigning the opinion partial weight, asserting it is unclear what aspect of Dr. Gebrail's assessment informed the RFC determination. As with the other opinions, the Commissioner asserts that the ALJ provided a reasonable basis for the weight he assigned this opinion. The undersigned agrees.

The ALJ was not incorrect in remarking that a number of Snipes's examinations were benign. Tr. at 1104. He observed that examinations in 2014 and 2015 were generally normal. Tr. at 1100. In 2016, she saw a neurologist for her reports of memory loss, but cognitive findings were essentially normal. Tr. at 1100–01. That October, Snipes displayed an unsteady gait with diminished sensation and reflexes. Tr. at 1101. The next month, she had a largely unremarkable physical exam, with a normal gait and normal range of motion. *Id.* To address her pain symptoms, providers recommended medication, creams, exercise, physical therapy, and injections. *Id.* One month later, Snipes reported an improvement in her pain symptoms. *Id.*

Snipes also treated with a rheumatologist. A May 2016 examination noted normal musculoskeletal findings, except for tenderness in the left wrist and a slightly ataxic gait. Tr. at 1101–02. She reported improvement the next month. Tr. at 1102. Follow-up appointments note some findings like tenderness, decreased spinal range of motion, and a slightly ataxic gait with providers prescribing medications. *Id.* By the end of the year, Snipes was "doing okay" and her symptoms were under fair control. *Id.* She had a normal physical examination, where a normal gait was observed. *Id.*

Podiatry records similarly document few serious concerns. In April 2016, Snipes had pain, reduced motion, and an antalgic gait. *Id.* After receiving steroid injections, she had tenderness and

pain with motion at two later appointments. *Id.* Following a November 2016 visit, Snipes sought no follow up care for almost a year. *Id.*

A March 2016 consultative psychological examination found no significant abnormalities. Tr. at 1098. Overall, her mental status exams were unremarkable. And Snipes had a positive response to mental health treatment. Tr. at 1098.

As the ALJ pointed out, primary care records showed generally normal examinations. Tr. at 1103. Some instances of an impaired gait and reduced strength were noted, but there were other occasions when Snipes had a normal gait and full strength. *Id.*

Imaging studies revealed degenerative changes. *Id.* Snipes's treatment was conservative, consisting mostly of medications and injections. *Id.* Pain in her neck, leg, joints, and lower extremity responded well to treatment. *Id.* The rheumatology records showed some tenderness but there were many normal physical examinations. *Id.* Despite complaints of memory loss, neuropsychological testing disclosed no cognitive impairment. *Id.* And both her sleep apnea and reflux were under control. *Id.*

In sum, the ALJ did not err is concluding that the longitudinal record was benign because there were no significant abnormalities that persisted over the course of the period at issue. Snipes may disagree with the ALJ's characterization of the overall record, but she has identified no evidence he failed to consider or shown any error in his evaluation.

The undersigned finds no error in the ALJ's characterization of Dr. Gebrail's findings as vague. As the ALJ pointed out, he did not define what he constituted "prolonged" standing and walking or "heavy" lifting. Tr. at 1104. So the court should decline the bid to conclude that the terms could be read to conflict with the RFC for a reduced range of light work.[7]

[7] Snipes maintains that the terms are inconsistent with light exertions work. To support her contention, Snipes cites *Richmond* v. *Colvin*, No. 7:11-CV-00147, 2013 U.S. Dist. Lexis, at *6–9 (E.D.N.C. Apr. 24, 2013). But her reliance

The ALJ discussion of Dr. Gebrail's assessment discloses how it fits with the RFC. He noted that limiting her to a range of light work addressed Snipes's pain, tenderness, and reduced range of motion. *Id.* Lifting within the parameters of light work does not explicitly conflict with Dr. Gebrail's directive to avoid heavy lifting. Where Dr. Gebrail's limitations on lifting were undefined, it is not unreasonable to conclude that it aligns with light work requirements, which would involve frequently lifting up to 10 pounds and occasionally lifting 20 pounds.

So the undersigned finds no error in the ALJ's consideration of Dr. Gebrail's opinion. The court should thus reject Snipes's argument on this issue.

**D. Residual Functional Capacity**

Snipes's second argument builds on the first issue—the ALJ misconfigured the RFC because it omitted the limitations assigned in the medical opinions. The Commissioner asserts the ALJ properly determined the RFC. Having found no flaws in the ALJ's evaluation the medical opinion evidence, the undersigned cannot conclude that the ALJ improperly determined Snipes's RFC. So this issue forms no basis for remand.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically

---

is misplaced. In *Richmond*, the court determined that the RFC for a full range of light work conflicted with a medical opinion that found a claimant had limitations with "prolonged standing or walking" but not "sedentary activities." *Id.* at *7–8. The court rejected the Commissioner's contention that the opinion used vague terms, noting that the ALJ proffered no such an explanation. *Id.* at *9. Remand was warranted because the ALJ not only failed to assign specific weight to the medical opinion but also did not explain the resolution of the inconsistency between the RFC for light work and the medical opinion limiting the claimant to sedentary activities. Here, in contrast, Dr. Gebrail made no findings about Snipes's ability to engage in sedentary work. The ALJ specifically cited Dr. Gebrail's use of vague terms as a basis to discount, in part, the conclusions he made. And the overall record coupled with Snipes's course of treatment did not support his findings, thus providing an additional basis to assign the assessment less weight. So even if Dr. Gebrail's assessment explicitly determined Snipes could not perform light work, the ALJ offered reasonable grounds to decline to fully endorse his opinion.

determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin,* 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that

may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

Here, the ALJ found that Snipes could perform light work with other limitations. Tr. at 1099. But Snipes contends that the RFC determination is unsound where the ALJ erred in evaluating the medical opinions and excluded restrictions they assessed. The undersigned disagrees.

Snipes premises her challenge to the RFC determination on her previous argument—the ALJ erred in considering the medical opinions and omitting the limitations they found. But the undersigned concluded that there was no error in the ALJ's assessment of the medical opinions.

Snipes's position amounts to disagreement with how the ALJ considered the evidence but falls short of showing error. And the court should decline her invitation to reconsider the evidence. *See Johnson*, 434 F.3d at 653 (observing that a reviewing court should not substitute its judgment for that of the ALJ).

Because this claim parallels her previous, unsuccessful argument, it lacks merit. So the undersigned recommends that the court deny her claim on this issue.

**E. Subjective Statements**

Snipes maintains that the ALJ erred in considering her subjective statements about her symptoms. She asserts that he wrongly discredited her allegations because they lacked the support of objective medical evidence. And Snipes disputes the ALJ's characterization that the record showed many normal examination or that her treatment consisted of conservative measures. So these reasons provide no bases to decline to endorse her statements.

The Commissioner claims that the ALJ correctly evaluated Snipes's statements, including her allegations of pain, and evaluated them against the record. Although the ALJ credited some of her allegations, he properly rejected them where the evidence undermined them.

The undersigned cannot agree with Snipes's contention that the ALJ required objective evidence to corroborate her statements. Finding no error in the ALJ's assessment of her allegation, the court should deny Snipes's claim on this issue.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016); 20 C.F.R. § 404.1529. First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. 2016 WL 1119029, at *3; § 404.1529(b).

If the claimant clears this threshold, at the second step the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine how much they limit the claimant's ability to work. *Id.* In making that determination, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig*, 76 F.3d at 595 (holding that claimant's allegations of pain need not be accepted to extent that they conflict with the record). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

No objective evidence is required in assessing the alleged symptoms at the second step. *Oakes* v. *Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F.3d at 95). Instead, "a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working[.]'" *Id.* (citing *Arakas*, 983 F.3d at 96); *see also Shelley C.* v. *Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023) (error to discount subjective statements based on objective medical evidence, or a lack of it, where condition may not produce such evidence).

But the ALJ does not have to accept the claimant's statements at face value. *Hawley* v. *Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013). The ALJ must balance the record evidence, mindful that "inconsistencies in the objective medical evidence is one

of the many factors" to consider in evaluating an individual's symptoms. SSR 16–3p, 2016 WL 1119029, at *5.

So although "contradictory evidence may discredit [claimant's] subjective statements . . . a mere absence of medical evidence should not." *Minchew* v. *Kijakazi*, No. 5:22-CV-214-FL, 2023 WL 5919333, at *8 (E.D.N.C. Aug. 21, 2023), *adopted by* 2023 WL 5916528 (E.D.N.C. Sept. 11, 2023); *see William J.* v. *Kijakazi*, Civ. No. 22–2962-BAH, 2023 WL 6518118, at *5 (D. Md. Oct. 5, 2023) ("[W]hile a claimant cannot be required to prove the extent and severity of their subjective complaints with objective evidence, such evidence—if it exists—may still be considered by the ALJ to evaluate those complaints.").

The ALJ concluded that Snipes's impairments could result in some of the symptoms alleged. Tr. at 1100. But the intensity, persistence, and limiting effects she claimed conflicted with the evidence in some ways. *Id.*

Snipes argues that the ALJ mischaracterizes the record as showing normal exams. But Snipes misstates the ALJ's description of the examination. He stated that they were "*generally* normal." *Id.* (emphasis added). And a review of his decision bears out that representation.

The ALJ did not ignore abnormal clinical signs or objective test results that examiners found. Instead, he noted evidence that both offered support for her claims of disabling symptoms and records that cast doubt on her allegations.

The ALJ noted that Snipes sought minimal treatment in 2014 and 2015. She relied on her primary care provider to prescribe medications for pain, anxiety, and depression.

After a normal physical examination in April 2016, providers referred her to specialists for diffuse pain, foot issues, and trouble with memory. Aside from a slightly antalgic gait and some tenderness, an examination the next month was unremarkable.

X-rays showed multilevel degenerative disc disease, but there were normal findings on laboratory tests and a brain MRI. Cognitive testing, too, was essentially normal. Her memory issues were believed to relate to her anxiety and depression or stem from her medication.

Later records that year showed some occasional issues, like increased pain, diminished sensation and reflexes, and an unsteady gait. But other records recorded a normal gait, normal motor functioning, and no need for an assistive device.

As the ALJ remarked, Snipes responded well to treatment. The rheumatologist noted occasional tenderness but there were many normal exam findings. Neurology found no cognitive impairment. Specialists observed an antalgic or slightly ataxic gait a times during a six-month period in 2016. But other records during that period and before recorded a normal gait. And there were fewer notations of reduced strength than there were records reflecting normal strength.

In sum, the undersigned cannot agree with Snipes's claim that the ALJ misrepresented the evidence. Instead, the lack of consistent, enduring, and significant clinical signs and findings supports his classification of the record as showing generally normal examinations. And Snipes identifies no evidence that the ALJ overlooked.

Snipes also challenges the ALJ's depiction of her treatment as conservative. Snipes points out that one medication was considered high-risk. A provider suspected that the multiple medication she took may contribute to her difficulties with cognition. Lacking additional explanation, Snipes argues that spinal injections cannot be considered routine and conservative modalities. While she had some relief of symptoms, her pain symptoms did not resolve. And frequent changes to her psychiatric medication coupled with the high doses prescribed likely contributed to some symptoms she experienced.

The undersigned finds no error in the ALJ's categorization of Snipes's treatment modalities, including medication, exercises, and injections, as conservative. "'[C]onservative treatment' is not defined in the regulations, but appears to encompass treatments that are less invasive than surgery." *Jason W.* v. *Saul*, No. 7:19-CV-352, 2020 WL 5578969, at *8 (W.D. Va. Sept. 17, 2020) (citing *Wilson* v. *Colvin*, No. 6:16-CV-06509-MAT, 2017 WL 2821560, at *6 (W.D.N.Y. 2017) (describing chiropractic treatment, physical therapy, and epidural injections as "relatively conservative" treatments)); *Stewart T.* v. *O'Malley*, No. 3:22-CV-612-MHL-SLS, 2024 WL 997160, at *11 (E.D. Va. Feb. 2, 2024) (noting conservative treatment "is commonly understood as encompassing treatments less invasive than surgery"), *adopted by* 2024 WL 994641 (E.D. Va. Mar. 7, 2024).

Courts have found similar measures to the treatment Snipes pursued to be conservative in nature. *See Sharp* v. *Colvin,* 660 F. App'x 251, 259 (4th Cir. 2016) (remarking that ALJ permissibly determined that treatment, which included injections, pain medication, and physical therapy, was conservative); *Daedalus D.* v. *O'Malley*, No. 2:23-CV-03504-MGB, 2024 WL 6963067, at *8 (D.S.C. July 30, 2024) (noting that the court "has consistently recognized medication management and injections are generally considered conservative treatment."); *Tranchant* v. *Kijakazi*, No. 2:22-CV-00050-D, 2023 WL 5199626, at *7 (E.D.N.C. July 21, 2023) (noting that conservative treatment included injections, medication, and a brace), *adopted by* 2023 WL 5184244 (E.D.N.C. Aug. 11, 2023). And Snipes's more moderate treatment measures detract from the severity of symptoms and resulting limitations she claims. *See Dunn* v. *Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]f all that the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is."); *Ellis* v. *O'Malley,* No. 5:23-CV-00332-RN, 2024 WL 3373510, at *9 (E.D.N.C. May 23,

2024) (observing that plaintiff's treatment of his symptoms, including medication, exercise, physical therapy, and injections, which the ALJ described as largely conservative, conflicted with the severity of symptoms alleged); *Richardson* v. *Colvin*, No. 4:14-CV-125-FL, 2015 WL 5725546, at *6 (E.D.N.C. Aug. 11, 2015) (concluding that conservative treatment lends little support to claims of debilitating symptoms), *adopted by* 2015 WL 5737613 (E.D.N.C. Sept. 30, 2015).

While Snipes may disagree with the ALJ's characterization of her treatment as conservative, there is no error in so finding.

And there is no merit to Snipes's contention that the ALJ required her to verify her symptoms with objective evidence. Rather, the ALJ properly considered her statements in conjunction with the record.

Although she alleged her disability began in 2014, Snipes sought minimal care for about two years. As noted, examinations generally yielded unremarkable findings, although there were some positive findings, like an abnormal gait, reduced motion, and tenderness, that appeared at times. Snipes reported feeling much better in June 2016. And later that year, after receiving injections, medication, and topical creams, Snipes reported an improvement in her pain symptoms, although some back pain continued. Snipes received injections at three podiatrist visits in 2016. She reported some relief and sought no follow-up care for almost a year.

Contrary to Snipes's contention, the ALJ did not cite the absence of objective evidence to discount her subjective statements. Rather, the ALJ properly considered how her allegations of symptoms followed, or departed from, the record. *See* SSR 19–4p. Consistency with the record is a distinct consideration from an absence of objective evidence.

Finding no error in the ALJ's consideration of Snipes's subjective statements about her symptoms, the undersigned recommends that the court deny Snipes relief on this issue.

## III. Conclusion

For all these reasons, the undersigned recommends that the court grant Bisignano's request for relief (D.E. 18), deny Snipes's request for relief (D.E. 12), and affirm the Commissioner's determination.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: August 3, 2026

Robert T. Numbers, II
United States Magistrate Judge